United States District Court
Southern District of Texas

**ENTERED**

November 11, 2015

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LAURA RICKLIN DEYO, as next   §
friend of D.N.,   §
  §
    Plaintiff,   §
  §
v.   §    CIVIL ACTION NO. H-14-2135
  §
TOMBALL INDEPENDENT SCHOOL   §
DISTRICT, ROBERT FROST,   §
JILL HAYES, and CHRIS TROTTER,   §
  §
    Defendants.   §

MEMORANDUM AND ORDER

Pending is Defendants Tomball Independent School District, Robert Frost, Jill Hayes, and Chris Trotter's Motion for Summary Judgment (Document No. 27). After carefully considering the motion, response, reply, and the applicable law, the Court concludes as follows.

I. Background

Principal Robert Frost ("Frost") and Assistant Principal Jill Hayes ("Hayes") were investigating a stink bomb incident at Tomball Intermediate School when "D.N.'s name was offered by other students as a possible person in possession of stink bombs."[1] D.N., a male sixth-grade student, initially denied having anything to do with the stink bombs, but after more students identified him, D.N. was

---

[1] Document No. 27-1 at 2 of 14.

called to Frost's office where he "finally admitted to having stink bombs."[2]   In D.N.'s written statement made shortly thereafter, he stated:  "I found a used box of stink bombs outside at recess.  An one of my friends asked where to get them and I said I don't know. N***** told me on facebook that he bought them.  N***** offered me one stink bomb for money."[3]

Hayes then began to search D.N. for the stink bombs while Frost was also present.[4]   She searched the pockets of D.N.'s hoodie,[5] where she found a hard metal object with four finger rings resembling a weapon commonly known as "knuckles," both sides of which are exhibited in the following photographs,[6] which are uncontroverted in the summary judgment evidence:

---

[2] Id. at 2 of 14.

[3] Id. at 6 of 14.

[4] See id. at 2 of 14; Document No. 27-2 at 2 of 3.

[5] The parties dispute the circumstances of this initial search.  According to Hayes's declaration, she "asked D.N. to take off his hoodie jacket, and initially searched his hoodie's pockets."  Document No. 27-1 at 2 of 14.   D.N. stated in his deposition that while he was sitting down, Hayes "reached over and put her hand in my jacket pocket and got the belt buckle out of my jacket pocket."  Document No. 27-5 at 7 of 37 to 8 of 37.

[6] Document No. 27-1 at 2 of 14; see also Document 27-3 at 6 of 17 to 13 of 17.



D.N. called the object a belt buckle, but, when Hayes and Frost found the object, it had no bar or appurtenance to which a belt could be attached for use as a belt buckle.[7]  Although he initially disclaimed ownership of the knuckles buckle, D.N. eventually admitted that it was from a boy named "Boo," who did not attend school with D.N., and that D.N. brought the knuckles buckle to school to give to another friend, who was supposed to return it to Boo.[8]  D.N. made a second written statement at that time with this explanation.[9]

Hayes continued to search D.N. for the stink bombs and also to determine whether D.N. had any other "weapons."[10]  Hayes searched the pockets of D.N.'s pants, although the parties dispute the manner of the search.  According to Hayes, she "asked D.N. if he had anything else on him (or words to that effect), and he pulled

---

[7] Document No. 27-1 at 3 of 14; Document No. 27-3 at 9 of 17. Plaintiff argues that "at the crux of this case" is whether the metal object "is a weapon made to resemble a belt buckle or a belt buckle made to resemble a weapon."  The uncontroverted evidence is that when found in D.N.'s pocket, the object could not hold or be used as a belt buckle.  Nonetheless, because on summary judgment the facts are viewed in the light most favorable to the non-movant, the metal object is sometimes referred to herein as the "knuckles buckle."  *See* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986).

[8] Document No. 27-1 at 3 of 14.

[9] Id. at 8 of 14.

[10] Id. at 3 of 14.

out his pockets . . . ."[11]  D.N. testified that after finding the knuckles buckle, Hayes "told me to stand up, lift my shirt up.  And then after I lifted my shirt up, I put it down, and she reached into my back pockets, palms into my pockets . . . ."[12]  Upon further questioning, D.N. stated that Hayes put "[b]oth hands, fingers straight down" into his front and back pockets.[13]

As a result of the search, Hayes found a dry erase marker with a nail in place of the felt tip, a written "Hit list," and a written "Death List."[14]  When asked about the dry erase marker, D.N. told Hayes that he got it from his math classroom, but D.N. later admitted that it came from the same person who gave him the knuckles buckle.[15]  D.N. also admitted that he created the lists of people at whom he and his friends were angry.[16]  Hayes also found an object resembling a "'corn cob' holder with approximately 1 inch needle point prongs" in D.N.'s backpack.[17]

Hayes brought D.N.'s mother, Plaintiff Laura Ricklin Deyo ("Plaintiff" or "Ms. Deyo"), into the office from the "car

---

[11] Id.

[12] Document No. 27-5 at 17 of 37.

[13] Id. at 18 of 37.

[14] Document No. 27-1 at 3 of 14; Document No. 27-3 at 15 of 17; Document No. 27-4 at 2 of 10, 4 of 10.

[15] Document No. 27-1 at 3 of 14.

[16] Id.

[17] Id.; Document No. 27-3 at 17 of 17.

ridership line," where she had been waiting to pick up D.N. at the end of the school day.[18]  After Hayes explained the situation to Ms. Deyo, D.N. made a third written statement in his mother's presence.[19]

D.N. was arrested and charged with felony possession of a prohibited weapon.[20]  Under the Tomball ISD School Code of Conduct, "[a] student **must** be expelled for any of the following offenses that occur on school property or while attending a school-sponsored or school-related activity on or off school property:  . . . Using, exhibiting, or possessing the following, as defined by the Texas Penal Code:  . . . A prohibited weapon, such as . . . knuckles."[21] Under the Code of Conduct, "knuckles" are defined as "any instrument consisting of finger rings or guards made of a hard substance and designed or adapted for inflicting serious bodily injury or death by striking a person with a fist enclosed in the knuckles."[22]

---

[18] Document No. 27-1 at 4 of 14.

[19] Id.  D.N. stated, "I got it from K*****'s friend B***/S.B. I had them with me so I can give them to K***** so K***** can give it back to S****."  Id. at 10 of 14.

[20] Document No. 27-3 at 3 of 17.  D.N. completed deferred adjudication for these charges on June 11, 2013.  Document No. 17 at 8 of 11.

[21] Document No. 27-7 at 23 of 31 to 24 of 31 (emphasis in original).

[22] Id. at 29 of 31.; see also TEX. PENAL CODE § 46.01(8) (defining "knuckles" using similar language).

Taking into consideration D.N.'s past disciplinary history, intent, the fact that D.N. changed his story multiple times, the "Hit list" and the "Death List," and that it "appeared to [Hayes and Frost] that the knuckles were perfectly capable of inflicting serious bodily injury," Hayes and Frost recommended expulsion.[23] Hayes provided to D.N.'s parents written notice of the recommendation and scheduled a hearing.[24]

Assistant Superintendent Chris Trotter ("Trotter") conducted the hearing.  Ms. Deyo and Mr. N., D.N.'s father, were present, but D.N. was not at the hearing.[25]  Hayes and Frost testified as to the reasons for their recommendation.[26]  Mr. N. and Ms. Deyo both made statements in rebuttal.[27]  Trotter also confirmed with the City of Tomball Police Department the charges pending against D.N. because the nature of the charges impacts punishment under the Code of Conduct.[28]  Based on the evidence presented at the hearing and the results of his own investigation, Trotter upheld the punishment. Written notice of the decision was provided to Ms. Deyo.[29]

---

[23] Document No. 27-1 at 4 of 14; Document No. 27-2 at 3 of 3.

[24] Document No. 27-1 at 14 of 14.

[25] Document No. 27-3 at 2 of 17.

[26] *See generally* Document No. 27-8.

[27] Id.

[28] Id. at 26 of 39; Document No. 28-3 at 3 of 3.

[29] Document No. 27-4 at 10 of 10.  D.N.'s punishment was expulsion from May 7, 2012 through October 3, 2012, with D.N.'s

D.N.'s parents appealed to the Tomball ISD Board of Trustees (the "Board") which, after a hearing, upheld the expulsion.[30] The punishment was never administered, however, because Ms. Deyo withdrew D.N. from public school, and he has been home schooled since May 2012.[31]

Two years later, Ms. Deyo, as next friend of D.N., filed this case in state court, alleging that Defendant Tomball Independent School District ("Tomball ISD") wrongfully expelled D.N.[32] After Tomball ISD removed the case to federal court, Plaintiff filed her Second Amended Complaint, adding Hayes, Frost, and Trotter ("Individual Defendants"), alleging Section 1983 claims for violations of the Fourth, Fifth, and Fourteenth Amendments and malicious prosecution against all Defendants.[33] All Defendants move for summary judgment to dismiss all claims.[34]

---

continued education to be provided at the Harris County Juvenile Justice Alternative Education Program ("JJAEP").  Id.

[30] Document No. 27-3 at 3 of 17, Document No. 27-9.

[31] Id.; Document No. 27-6 at 10 of 17.

[32] Document No. 1-1 (Orig. Pet.).

[33] Document No. 17.  By Order signed January 27, 2015, the Court dismissed Plaintiff's Fifth Amendment and malicious prosecution claims against Defendant Tomball Independent School District.  Document No. 20.

[34] Document No. 27.

## II. Legal Standard

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. Id. "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Id. 56(c)(3).

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct.

2505, 2513 (1986).  All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 106 S. Ct. 1348, 1356 (1986).  "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper.  <u>Kelley v. Price-Macemon, Inc.</u>, 992 F.2d 1408, 1413 (5th Cir. 1993).  On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper."  <u>Id.</u>  Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial."  <u>Anderson</u>, 106 S. Ct. at 2513.

### III. <u>Analysis</u>

Plaintiff alleges under Section 1983 claims against all Defendants for violations of the Fourth and Fourteenth Amendments and malicious prosecution.[35]  Defendants collectively move for summary judgment on the grounds that they did not violate D.N.'s constitutional rights, and the Individual Defendants assert the defense of qualified immunity.[36]

---

[35] Document No. 17; as observed above at note 33, Plaintiff also alleged a Fifth Amendment violation, which was dismissed by Order signed January 27, 2015.

[36] Document No. 27.

A.    Plaintiff's Malicious Prosecution Claim

Defendants   correctly   argue   that   in   the   Fifth   Circuit "'malicious  prosecution'  standing  alone  is  no  violation  of  the United  States  Constitution,  and  that  to  proceed  under  42  U.S.C. § 1983  such  a  claim  must  rest  upon  a  denial  of  rights  secured  under federal  and  not  state  law."  Castellano  v.  Fragozo,  352  F.3d  939, 942  (5th  Cir.  2003)  (en  banc);  *see*  Cuadra  v.  Hous.  Indep.  Sch. Dist.,  626  F.3d  808,  812  (5th  Cir.  2010)  ("To  the  extent  that Cuadra  alleges  that  the  Appellees  violated  his  constitutional rights  by  engaging  in  malicious  prosecution,  that  argument  is foreclosed  by  our  decision  in  Castellano  v.  Fragozo.").  The  Fifth Circuit  further  explained  that:

> The initiation of criminal charges without probable cause
> may set in force events that run afoul of explicit
> constitutional protection--the Fourth Amendment if the
> accused is seized and arrested, for example, or other
> constitutionally secured rights if a case is further
> pursued.  Such claims of lost constitutional rights are
> for violation of rights locatable in constitutional text,
> and some such claims may be made under 42 U.S.C. § 1983.
> *Regardless, they are not claims for malicious prosecution*
> *and labeling them as such only invites confusion.*

Castellano,  352  F.3d  at  953-54  (emphasis  added).

Neither  Plaintiff's  Second  Amended  Complaint  nor  Plaintiff's Memorandum  in  Response  to  Defendant's  Motion  for  Summary  Judgment identifies  a  constitutional  violation  upon  which  the  malicious prosecution  claim  is  predicated.   Accordingly,  Defendants  are

entitled to summary judgment on Plaintiff's claim under § 1983 for malicious prosecution of D.N.[37]

To the extent Plaintiff alleges a state law action against the Individual Defendants for malicious prosecution, the Court in its discretion declines to exercise supplemental jurisdiction, and dismisses that state law claim without prejudice. *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction . . . if . . . (3) the district court has dismissed all claims over which it has original jurisdiction."); *see* Enochs v. Lampasas Cty., 641 F.3d 155, 161 (5th Cir. 2011) ("Our general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed.").

B.  <u>Plaintiff's Fourteenth Amendment Claims</u>

As part of Plaintiff's § 1983 claim, she argues that "D.N. was denied due process and equal protection under the law when he was issued the most severe punishment in the disciplinary scheme available to administrators in [Tomball ISD] without consideration of other factors."[38]  All Defendants move for summary judgment

---

[37] By Order signed January 27, 2015, Plaintiff's claim against Tomball ISD for malicious prosecution pled under state law apart from section 1983 was dismissed as barred by sovereign immunity. Document No. 20.

[38] Document No. 28 at 6 of 20.  The "other factors" to which Plaintiff refers include "(A) self-defense; (B) intent or lack of intent at the time the student engaged in the conduct; (C) a student's disciplinary history; or (D) a disability that

arguing that D.N. received all process to which he was entitled and the punishment he received was based on the mandatory requirements under the Texas Education Code.[39]

### 1.   Due Process

When a state creates a public school system with mandatory attendance, the state cannot completely deprive the student of that property interest without due process of law. Goss v. Lopez, 95 S. Ct. 729, 736 (1975).   In Goss, the Supreme Court held that, at minimum, a student facing a 10-day suspension "must be given some kind of notice and afforded some kind of hearing." Id. at 738. The Court also recognized that more formal procedures may be required in cases of more severe punishments. Id. at 741. In the case of expulsion from a public education institution, the Fifth Circuit has held that due process requires notice and an opportunity to be heard. Dixon v. Ala. St. Bd. of Educ., 294 F.2d 150, 151 (5th Cir. 1961).

Additionally, the Fifth Circuit "has consistently held that a student who is removed from her regular public school, but is given access to an alternative education program has not been denied her

---

substantially impairs the student's capacity to appreciate the wrongfulness of the student's conduct." TEX. EDUC. CODE ANN. § 37.001(a)(4).

[39] Document No. 27 at 23 of 39 to 26 of 39; Document No. 29 at 10 of 13 to 11 of 13.

entitlement to public education." <u>Swindle v. Livingston Parish Sch. Bd.</u>, 655 F.3d 386, 394 (5th Cir. 2011); <u>Harris ex rel. Harris v. Pontotoc Cty. Sch. Dist.</u>, 635 F.3d 685, 690 (5th Cir. 2011) ("A student's transfer to an alternative education program does not deny access to public education and therefore does not violate a Fourteenth Amendment interest.").

When D.N. was told he was to be expelled through October 3, 2012, his parents were also advised that he would be admitted "at Harris County [Juvenile Justice Alternative Education Program ("JJAEP")]."[40]   Because D.N. was permitted to serve his punishment in an alternative education program, he was not denied access to public education and, accordingly, his Fourteenth Amendment property interest in a free public education was not violated. *See* <u>Nevares v. San Marcos Consol. Indep. Sch. Dist.</u>, 111 F.3d 25, 26 (5th Cir. 1997) (finding that being "transferred from one school program to another program with stricter discipline" is not the equivalent of a denial of access to public education).

---

[40] Document No. 27-4 at 10 of 10.   Under Texas law, "A juvenile justice alternative education program [("JJAEP")] must focus on English language arts, mathematics, science, social studies, and self-discipline.   Each school district shall consider course credit earned by a student while in a [JJAEP] as credit earned in a district school."   TEX. EDUC. CODE ANN. § 37.011(d). "Academically, the mission of juvenile justice alternative education programs shall be to enable students to perform at grade level . . . .   [A] student enrolled in a [JJAEP] is reported as if the student were enrolled at the student's assigned campus in the student's regularly assigned education program, including a special education program."   <u>Id.</u> § 37.011(h).

Moreover, D.N. was accorded all process due under the requirements of the Due Process Clause of the Fourteenth Amendment. *See* <u>Dixon</u>, 294 F.2d at 158-59 (explaining the notice and hearing requirements necessary to satisfy due process). Assistant Principal Hayes gave written notice to D.N.'s parents of the claims against D.N., of the date, time, and place for the expulsion hearing, and invited the parents to contact Hayes if the date was not convenient for them so that a different date could be set.[41] D.N. and his representatives were given the opportunity to testify and to present evidence and witnesses.[42] Although D.N. did not attend the hearing, his parents did and spoke on his behalf to argue against the expulsion.[43] D.N. was also accorded a right to appeal the expulsion,[44] which exceeded the requirements of constitutional due process. *See* <u>Brewer v. Austin Indep. Sch. Dist.</u>, 779 F.2d 260, 263 (5th Cir. 1985) ("Although schools may wish to provide appellate mechanisms to cure procedural errors that can creep into initial suspension proceedings, they are not required to do so by the Constitution. Due process need only be

---

[41] Document No. 27-1 at 4 of 14, 14 of 14.

[42] *See* <u>id.</u> at 14 of 14.

[43] Document No. 27-6 at 8 of 17. In his declaration, Trotter stated that "I allowed both Ms. Deyo and Mr. N to tell me whatever they wanted. I did not place any time limits on them or cut them off, but instead asked several times if they had anything else they wanted to share with me." Document No. 27-3 at 2 of 17.

[44] Document No. 27-9.

provided once."). The uncontroverted summary judgment evidence is that Defendants accorded to D.N. all process to which he was due under the Fourteenth Amendment, and Defendants are entitled to summary judgment on this claim.

2.   Equal Protection

Defendants correctly argue that they are entitled to summary judgment on Plaintiff's equal protection claim because Plaintiff failed to provide evidence that D.N. received unequal treatment. "To maintain an equal protection claim, a plaintiff typically alleges that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from discriminatory intent." Clayton ex rel. Hamilton v. Tate Cty. Sch. Dist., 560 Fed. App'x 293, 297 (5th Cir. 2014)(quoting Club Retro, LLC v. Hilton, 568 F.3d 181, 212 (5th Cir. 2009)) (internal quotations omitted).

Plaintiff conclusorily claims, without providing evidentiary support, that other students in the Texas public school system "receive disciplinary consequences where the statutory factors are considered and weighed,"[45] but this was not done in D.N.'s case.[46] Defendants Hayes, Frost, and Trotter each provided a declaration

---

[45] Defendants correctly object to this blanket statement as "conclusory and highly speculative." Document No. 29 at 10 n.4 of 13.

[46] Document No. 28 at 7 of 20.

16

stating that they did in fact consider intent and disciplinary history when making their decision to recommend expulsion.[47] Plaintiff has submitted no evidence to refute this testimony, and nothing of record evidences any treatment of D.N. different from other similarly situated students as a result of discriminatory intent on the part of the Defendants.  Defendants are entitled to summary judgment on Plaintiff's equal protection claim.

C.   Plaintiff's Fourth Amendment Claim

Plaintiff contends that Defendants violated D.N.'s Fourth Amendment right to be free from unreasonable searches and seizures when "Hayes, a female assistant principal, physically searched D.N., a young boy enrolled in sixth grade."[48]  Defendants argue that this was no Fourth Amendment violation.   Even assuming *arguendo* that there was a violation, Tomball ISD argues that the claim against it fails under Monell v. Dep't of Soc. Servs. of City of New York, 98 S. Ct. 2018 (1978), and the Individual Defendants argue that they are entitled the defense of qualified immunity.[49]

---

[47] Document No. 29 at 10 of 13.  *See also* Document No. 27-1 at 4 of 14; Document No. 27-2 at 3 of 3; Document No. 27-3 at 3 of 17. Defendants argue that the remaining factors were not considered because they were not applicable to the resolution of D.N.'s case. *See* Document No. 29 at 10 n.6 of 13.

[48] Document No. 28 at 3 of 20; Document No. 17 at 7 of 11.

[49] Document No. 27 at 33 of 39.

17

1.    Tomball ISD's Liability under § 1983

A school district cannot be held liable on the theory of *respondeat superior*. <u>Id.</u> at 2036. Instead, "[m]unicipal liability under 42 U.S.C. § 1983 requires proof of 1) a policy maker; 2) an official policy; 3) and a violation of constitutional rights whose 'moving force' is the policy or custom." <u>Rivera v. Hous. Indep. Sch. Dist.</u>, 349 F.3d 244, 247 (5th Cir. 2003) (citing <u>Piotrowski v. City of Houston</u>, 237 F.3d 567, 578 (5th Cir. 2001)). A § 1983 plaintiff must support his claims with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations. <u>Streetman v. Jordan</u>, 918 F.2d 555, 557 (5th Cir. 1990). Accordingly, in order to sustain a claim against Tomball ISD, Plaintiff must prove that the Tomball ISD Board of Trustees[50] had an official policy or custom that was the "moving force" behind the constitutional violation alleged.

An official custom or policy typically arises out of a pattern of activity; however, under limited circumstances, single episodes can also give rise to liability. *See* <u>City of St. Louis v. Praprotnik</u>, 108 S. Ct. 915, 924 (1988). For example, "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the

---

[50] Under Texas law, policymaking authority for an independent school district lies with the district's board of trustees. <u>Jett v. Dall. Indep. Sch. Dist.</u>, 7 F.3d 1241, 1245 (5th Cir. 1993) (citing TEXAS EDUC. CODE ANN. § 23.01).

municipality because their decision is final." <u>Id.</u> at 926.  The ratification theory of liability is limited to "extreme factual situations." <u>Peterson v. City of Fort Worth, Tex.</u>, 588 F.3d 838, 848 (5th Cir. 2009).

The Board upheld Trotter's decision at a hearing held on June 11, 2012.[51]  Plaintiff never alleged or complained to the Board that Hayes or anyone else had conducted an illegal search of D.N.[52] When asked why her attorney at the hearing did not say anything to the Board about the search, Ms. Deyo responded, "I don't know."[53] Because there is no evidence that the Board had any knowledge about the violation now claimed, the Board's action in no way ratified Hayes's decision to search D.N. as she did.  *See* <u>Praprotnik</u>, 108 S. Ct. at 926.

Plaintiff further argues, without support in the summary judgment evidence, that based on the "specialized knowledge and training that members of boards of trustees in public school districts (final policy makers) in Texas receive, they knew or should have known that the manner in which the investigation and punishment of D.N. was handled by school officials was illegal."[54] Although Plaintiff correctly identifies the Board as the final

---

[51] Document No. 27-3 at 3 of 17.

[52] *See generally* Document No. 27-9.

[53] Document No. 27-6 at 9 of 17.

[54] Document No. 17 at 16 of 20.

policymaker, Plaintiff fails to present any evidence that would raise a genuine issue of material fact that there was a widespread pattern of unconstitutional behavior such as to constitute an official custom or policy.[55]   Unsubstantiated allegations that the Board knew or should have known that the conduct was illegal are insufficient to impose municipal liability.   Accordingly, because Plaintiff's summary judgment evidence fails to raise a fact issue that there was an official custom or policy that was the 'moving force' behind the alleged violations, Defendant Tomball ISD is entitled to summary judgment on Plaintiff's Fourth Amendment claim.

2.   The Individual Defendants' Liability

In response to Plaintiff's Fourth Amendment claim, the Individual Defendants raise the defense of qualified immunity.[56] "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam).   Therefore, Plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080

---

[55] *See generally* Document Nos. 17, 28.

[56] Document No. 27 at 33 of 39.

(2011) (quoting <u>Harlow v. Fitzgerald</u>, 102 S. Ct. 2727, 2738 (1982)).

The Supreme Court has "recently reaffirmed that lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first," and that lower courts should "think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" <u>Id.</u> (quoting <u>Pearson v. Callahan</u>, 129 S. Ct. 808, 818 (2009)). Given this guidance, the court turns to the second prong of the analysis.

> When considering a defendant's entitlement to qualified immunity, we must ask whether the law so clearly and unambiguously prohibited this conduct that "*every* 'reasonable official would understand what he is doing violates [the law].'" <u>al-Kidd</u>, 131 S. Ct. at 2083 (emphasis added) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). To answer that question in the affirmative, we must be able to point to controlling authority--or a "robust 'consensus of persuasive authority'" <u>id.</u> at 2084 (citing <u>Wilson v. Layne</u>, 526 U.S. 603, 617, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999))--that defines the contours of the right in question with a high degree of particularity.

<u>Morgan v. Swanson</u>, 659 F.3d 359, 371-72 (5th Cir. 2011) (en banc). In other words, the Supreme Court "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question *beyond debate.*" <u>al-Kidd</u>, 131 S. Ct. at 2083 (emphasis added).

21

Plaintiff argues that "Hayes searched D.N. in an inappropriate and unreasonable manner" by reaching her hands into D.N.'s pockets to search for additional contraband after D.N. was found in possession of the knuckles buckle.[57]  In N.J. v. T.L.O., the Supreme Court addressed the legality of searches in public schools, recognizing that students maintain the right to be free from unreasonable searches and seizures by school officials.  105 S. Ct. 733, 738 (1985).  The Court held that whether a search of a student is reasonable, and therefore constitutional, depends on a two-part inquiry: (1) the action must have been "justified at its inception" and (2) "reasonably related in scope to the circumstances which justified the interference in the first place."  Id. at 742-43 (quoting Terry v. Ohio, 88 S. Ct. 1868, 1879 (1968)).

A search is justified "when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school."  Id. at 743.  Here, Frost and Hayes were investigating an incident involving stink bombs during which D.N.'s name came up multiple times.[58]  Although he initially denied it, D.N. eventually admitted, in writing, that he had stink bombs,[59] which was a violation of school rules.   These facts were sufficient to

---

[57] Document No. 17 at 3 of 11; Document No. 28 at 4 of 20.

[58] Document No. 27-8 at 5 of 39 to 6 of 39.

[59] Document No. 27-1 at 6 of 14.

establish reasonable grounds for Hayes to search for the stink bombs. *See* id. at 744-45. Finding the knuckles buckle, which resembled a weapon, also gave Hayes additional grounds to continue the search. *See* id. at 745-46. Therefore, the search of D.N. was "justified at its inception." Id. at 743.

The second prong of the analysis considers the scope of the search. A search is permissible in scope "when the measures adopted are reasonably related to the objectives of the search and *not excessively intrusive in the light of the age and sex of the student and the nature of the infraction*." Id. (emphasis added). Plaintiff objects to "the manner in which the search was conducted and to the school official who conducted the search."[60] According to D.N., Hayes reached "all the way down" into the front and back pockets of his skinny jeans after she found the knuckles buckle.[61] Therefore, because the Individual Defendants assert the qualified immunity defense, the question before the court is whether the manner in which Hayes conducted this search was objectively unreasonable in light of clearly established precedent at the time of the search. *See* Jackson v. Ladner, ___ Fed. App'x. ___, No. 13-60631, 2015 WL 5332664, at *5 (5th Cir. Sept. 15, 2015) (per curiam).

---

[60] Document No. 28 at 3 of 20.

[61] Document No. 28-2 at 3 of 4.

23

In Safford Unified School District No. 1 v. Redding, the Supreme Court held that a strip search of a thirteen-year-old female student was "excessively intrusive" and unreasonable because the nature of the contraband she was accused of possessing (ibuprofen) was not dangerous, and there were no facts suggesting that the contraband was hidden in her underwear. 129 S. Ct. 2633, 2642-43 (2009). The Court made a distinction between searches of the student's outer clothing and strip searching, indicating that a strip search "requir[ed] distinct elements of justification on the part of the school authorities for going beyond a search of outer clothing and belongings." 129 S. Ct. at 2641.

Plaintiff cites to Redding, to argue the "sensitivities of adolescents subjected to physical searches."[62] The conduct alleged here, however, was not a "strip search," and--with the exception of his hoodie jacket (see supra at 2, n. 5)--D.N. was not asked to remove any of his outer garments. The extent of the search, with both the school principal and assistant principal present, was merely to reach into D.N.'s pants pockets to determine if D.N. was in possession of any other contraband. See e.g., H.Y. ex rel. K.Y. v. Russell Cty. Bd. of Educ., 490 F. Supp. 2d 1174, 1186 (M.D. Ala. 2007) (holding searches of a male student's front and back pockets by a female administrator, as distinguished from a strip search, did not violate the Fourth Amendment).

---

[62] Document No. 28 at 4 of 20.

24

Plaintiff points to no authority holding under circumstances such as this, that a school principal's or assistant principal's search of a male student's pockets by reaching into them while the student is fully clothed is an objectively unreasonable or unconstitutional search.[63]   Although it is highly improbable that the facts as stated here by Plaintiff amount to a constitutional violation, it is clear as a matter of law that the conduct did not violate a "clearly established" right and, at the very least, the Individual Defendants are entitled to qualified immunity on Plaintiff's Fourth Amendment claim.

## IV. <u>Order</u>

For the foregoing reasons, it is

ORDERED that Defendants Tomball Independent School District, Robert Frost, Jill Hayes, and Chris Trotter's Motion for Summary Judgment (Document No. 27) is GRANTED IN PART and Plaintiff Laura Ricklin Deyo's Section 1983 claims for violations of the Fourth and Fourteenth Amendments and malicious prosecution, are DISMISSED WITH PREJUDICE.   It is further

ORDERED that Plaintiff Laura Ricklin Deyo's remaining state law claim for malicious prosecution against Defendants Robert Frost, Jill Hayes, and Chris Trotter is DISMISSED WITHOUT PREJUDICE.

---

[63] *See generally* Document No. 28 at 2 of 20 to 6 of 20.

<u>Plaintiff is reminded that the period of limitations to file her state claim in state court is tolled for a period of thirty (30) days after the claims are dismissed unless state law provides for a longer tolling period.  28 U.S.C. § 1367(d).</u>

The Clerk will enter this Order and provide a correct copy to all parties.

SIGNED at Houston, Texas on this ___11TH___ day of November, 2015.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE